Victor L. PARKS, Appellant,

v.

Arthur FIRGARD, Appellee.

No. 53074.

Supreme Court of Iowa.

Dec. 10, 1968.

Finley & Teas and Stanley L. Haynes, Mason City, for appellant.

William Pappas, Mason City, for appellee.

MASON, Justice.

Plaintiff Victor L. Parks appeals from judgment entered on a jury verdict returned in his action to recover for injuries sustained November 16, 1962, in a farm accident which occurred while he is alleged to have been employed by defendant Arthur Firgard. In response to the special interrogatory, "Do you find at time and place of plaintiff's injury he was an employee of defendant?" the jury answered, "No."

I. Plaintiff contends the trial court erred in refusing his requested instruction 4 and in failing to incorporate in instruction 8 as given the legal propositions raised in his requested instruction. This is the only attack directed to instructions or rulings on evidence.

Plaintiff alleged that on and before November 16, 1962, he was employed by defendant and during discharge of his duties

pursuant to this employment he was injured while driving a tractor pulling a load of corn from a field. He asserts his injuries were caused by defendant's failure to provide him a safe place to work and in failing to provide a tractor with proper lights.

Defendant in answer to plaintiff's petition denied plaintiff was employed by him on November 16 or that defendant was negligent; alleged plaintiff was guilty of negligence which was a proximate cause of his injuries and had assumed the risk; and asked that plaintiff's petition be dismissed.

Plaintiff's specifications of negligence were submitted to the jury.

The accident giving rise to this lawsuit occurred about 7 p.m. on the Cahill farm northeast of Mason City. Defendant had set up his drying equipment in the farmyard and was in the process of drying a batch. Plaintiff was returning from the field pulling a load of wet corn with Cahill's tractor which had only one working headlight. As plaintiff attempted to maneuver the rig into position for the drier, the tractor hit a stump throwing him to the ground under the draw bar. The pin in the draw bar caught plaintiff's clothing and was gouged into his lower back resulting in injuries for which he seeks recovery.

The issue in the trial court and here is whether at the time of the accident plaintiff was employed by defendant.

The appeal presents the question whether under the evidence plaintiff was entitled to have submitted to the jury his requested instruction on exchange of labor to the effect that if at the time of the accident he was helping defendant under a neighborly exchange of work he would then be defendant's employee.

Plaintiff timely requested as instruction 4:

"There is evidence that, after the welding of the dryer on the morning of the ac-

cident, plaintiff continued to help the defendant in what defendant claimed was a neighborly exchange, and that such neighborly exchange had taken place between the parties in previous years, and if you find at the time of the accident Victor Parks was assisting the defendant, Arthur Firgard, as a neighborly exchange of farm help, you may find that the relationship of employer-employee is present, whether there is any actual exchange of money as pay or compensation or not.

"You are further instructed that by the scope of employment, servant's duties are to be defined by what he was employed to perform and by what, to the knowledge and approval of his master, he actually did perform, rather than by the mere verbal designation of services he was to render, and that the relationship and scope may be either express or implied from all the circumstances, and an employee does not cease to be in the course or scope of his employment merely because he is not actually engaged in doing some specifically prescribed task, if at the time he is doing some act which he deems necessary for the benefit or interest of his employer."

II. Plaintiff and defendant, farmers living near each other in Cerro Gordo County, had been acquainted for 30 years and had exchanged farm labor frequently during the years. From 1959 through 1963 defendant owned a portable grain drier and allied equipment consisting of several wagons, a propane gas tank and a trailer house, doing custom corn drying.

Defendant describes custom corn drying as an operation where the farmer brings the corn from the field to the drier, it is then placed in the drier, tested for moisture and, when dry, taken from the drier and put back on the farmer's wagon. We are told that when the corn drying operation is in progress it is the practice to continue through the night until the job is completed.

At least one year before the accident plaintiff had employed defendant to dry

his corn and had worked with defendant in the process. Defendant was again employed to dry plaintiff's corn in 1962. When the drying process of plaintiff's corn had been completed defendant asked plaintiff if he would help him with corn drying jobs for a Mr. Gaffney and Mrs. Blau, told him if he would, defendant would pay him $5 a batch which is approximately 500 bushels, the amount of corn which could be dried at one time. At that time defendant did not have any other corn drying jobs lined up. Plaintiff testified he agreed and they started drying the Gaffney corn immediately.

The Gaffney corn was hauled to Oscar Firgard's farm, where defendant's equipment had been set up while drying plaintiff's corn. Plaintiff's brother, Orbra, hauled most of the corn with possibly some help from Mr. Gaffney. It was dried, reloaded and returned to the Gaffney farm. Defendant did not know who did the actual picking and shelling on the Gaffney place but plaintiff helped him on the drier at Oscar's farm. When finished with the Gaffney corn they moved defendant's equipment to the Blau farm, a distance of three miles. At the Blau farm defendant's two brothers and Orbra were involved in the picker-sheller operation. Plaintiff again helped run the drier.

At the Blau operation the men hauling from the picker to the drier didn't keep up with the drier and at times plaintiff and defendant would go to the field to meet them, exchange an empty wagon for a loaded one and return to the drier. The drying operation continued through the night and into the next day until completed. When the Blau job was finished plaintiff and defendant returned some of the equipment to defendant's farm late in the afternoon of November 15.

Up to this point there is not much dispute in the facts.

III. The real dispute appears to be the relationship between plaintiff and defendant at the time of the accident.

Plaintiff admits defendant asked him to help dry the Gaffney and Blau corn at $5 a batch and although reluctant because he had other farm chores at his own farm, he agreed and did in fact work on both projects until completed. However, he contends there was no change in the arrangement of employment which existed on the days prior to his injury; that he had continued to work for defendant and his employment by defendant was uninterrupted until the time of the accident.

In support of this contention plaintiff emphasizes the fact that while the parties were drying the Blau corn, Joe Cahill contacted defendant November 15 about drying corn. Although he did not hear the conversation plaintiff asserts defendant told him afterwards of the new job and he agreed to help defendant on the drier at the Cahill farm. When plaintiff returned to defendant's farm the morning of November 16 defendant was straightening, welding and preparing the equipment for the Cahill job. Plaintiff helped defendant an hour or two with the repairing. He asserts the parties had no conversation about moving the equipment but when the repairs were completed they hitched the drier and some equipment to separate vehicles and proceeded to Cahill's.

After plaintiff helped set up the drier and auxiliary equipment in the Cahill yard he and defendant looked over the equipment available for use and determined Cahill's elevator was short and needed repair. When plaintiff was ready to return to his home defendant rode along to pick up his jeep and house trailer at the Firgard farm. On the way they stopped in Rockwell to discuss the elevator situation with Cahill. In the conversation defendant offered to rent his elevator to Cahill for a cent a bushel. Plaintiff testified defendant told Cahill this amount was to be paid plaintiff as an inducement to stay on and plaintiff agreed. Cahill later paid plaintiff $53.

Plaintiff and defendant left Rockwell, stopped at plaintiff's home and then pro-

ceeded to Firgard's farm. Defendant took his jeep and trailer house, plaintiff pulled one or two wagons behind his pickup and both returned to the Cahill place about 2:30 in the afternoon. By this time there were at least three loads of wet corn available for drying. After plaintiff and defendant filled the drier plaintiff and Orbra returned to Firgard's farm, picked up their tractor and defendant's elevator and tractor and again returned to Cahill's and helped spot the elevator.

Plaintiff contends he helped with repairing and moving of equipment pursuant to the agreement made with defendant.

Corn which defendant had dried while plaintiff and Orbra were after the elevator was emptied into a wagon, pulled to the side and plaintiff helped refill the drier but did not elevate any corn. Plaintiff then made his first trip to the field on Cahill's tractor for a load of wet corn. On his return the accident occurred.

Defendant on the other hand maintains he hired plaintiff to help on the drier on the Gaffney and Blau projects for $6. a batch and plaintiff agreed to work for him on those terms. Defendant asserts that when he first learned of the Cahill job through his brothers, plaintiff had already advised him he had farm work at home which required his attention and after accepting the Cahill job defendant made arrangements for another helper on the drier and did not ask plaintiff to work on this phase of the operation.

Defendant's two brothers and Orbra Parks were again conducting the "picker-sheller operation" with Orbra hauling corn from the field to the drier. Defendant's nephew Jerry Firgard arrived at Cahill's about 5 p.m., shortly before plaintiff returned with the elevator and helped defendant run the drier. Defendant paid Jerry but did not pay his brothers, Orbra Parks or plaintiff on the Cahill operation.

Defendant admits that at the Blau operation on at least one occasion he and plaintiff went to the field to exchange an empty wagon for a loaded one. However, he contends that hauling the corn from the field to the drier was not any part of defendant's drier operation; it was up to the farmer to either bring in the corn or hire and pay men to do so.

Defendant further contends when they returned his equipment from the Blau farm November 15 his contract with plaintiff had been completed and the employer-employee relationship terminated. He maintains there never was any conversation about plaintiff helping with the drying operation at the Cahill farm. Nor did plaintiff ever ask defendant about helping with the drying operation there. He asserts he told plaintiff he appreciated his help in repairing the drier November 16 and when plaintiff offered to help move the equipment to Cahill's he reminded plaintiff about his own pressing farm work, but plaintiff insisted he would stay and help through the day and then do his work. Defendant maintains both the assistance with repair and moving the equipment was just a friendly or neighborly exchange without any prior arrangement between the parties.

A written statement signed by plaintiff while in the hospital following his injury was received in evidence. Some matters contained therein contradict plaintiff's testimony at trial. When confronted with the statement as a witness plaintiff maintained the sentence, "Joe and I made an arrangement whereby I would work for him and run Art's [Firgard's] elevator" was incorrect and he had actually agreed to work for defendant through Cahill. Of course, any inconsistency between matters contained in a previous statement given by plaintiff and his testimony as a witness, evidence offered by him in the trial or his pleadings is admissible for the jury's consideration.

IV. Defendant argues in support of the court's ruling that where there is an express contract between the parties there cannot be an implied contract based on a

neighborly exchange of farm labor covering the same subject matter. He maintains plaintiff seeks to imply a contract of employment from evidence of exchange of labor between the parties in the past even though he is claiming here to have been working at the time of the accident under an express contract.

Defendant refers to the familiar rule that while there may be an implied contract on a point not covered·by·an express contract certainly there can be no implied contract on a point fully covered by an express contract and in direct conflict therewith and having pleaded an express oral contract plaintiff cannot recover on an implied contract or quantum meruit. See Sitzler v. Peck, Iowa, 162 N.W.2d 449, filed November 12, 1968, as support for this statement with collection of authorities.

■ But plaintiff maintains in written argument his is not a case of an employee attempting to rely on both an express and an implied contract; it is an attempt by defendant to escape liability because of claimed cessation of a master-servant relationship; and such defense requires defendant to assume the burden of proving it.

As previously noted plaintiff alleged in paragraph 2 of his petition "that prior to and on the 16th day of November, 1962, plaintiff was employed by defendant". This allegation was put in issue by defendant's denial, thus placing the burden of proving the relationship on plaintiff.

"As a general rule, before one can claim the status of an employee entitled to recover as such against his employer for personal injuries, he must be engaged by another person to perform work or services as directed and controlled by the employer and on the latter's promise to pay compensation for such services." 56 C.J.S. Master and Servant § 174.

Plaintiff offered evidence of an express contract of employment to help defendant on the drier at the Gaffney and Blau tasks at $5 a batch. Defendant admitted this was their agreement. The existence of an employer-employee relationship was established. Plaintiff's difficulty arises when he attempts to maintain his burden of proving this express oral agreement, although completed by its terms, was in effect while he worked at the Cahill place.

We do not find the reference to the record following the Cahill conversation with defendant made by plaintiff in written argument supports his contention that defendant "told him of this new job to be done and that he agreed to again go and help appellee [defendant] with the Cahill job". Nor do we find support for his contention stated Division III, supra, that "he helped with repairing and moving equipment pursuant to the agreement made with defendant".

■ We do not understand plaintiff to contend that he was working as defendant's employee under an agreement for exchange of labor between the parties, but rather having established the existence of the relationship on the Blau and Gaffney jobs it continued to the time of injury. Once defendant offered evidence in support of his contention that the employer-employee relationship was terminated after return of the equipment from the Blau job and his assertion that any work performed by plaintiff after that time was merely a friendly or neighborly act, plaintiff became entitled to an instruction setting forth principles raised in his request. We do not agree.

Under his denial defendant was entitled to introduce evidence on this issue contradicting that offered to sustain plaintiff's burden. This was the purpose of the evidence offered by defendant.

■ We recognize "even where there is no specific arrangement for pay, but there is an exchange of work between farmers and an agreement that under such conditions one farmer performs services for the other, we have held the relationship of

master and servant is present. [Citing authorities]" Erickson v. Erickson, 250 Iowa 491, 495, 94 N.W.2d 728, 730. However, this is not a situation where the evidence establishes plaintiff came to defendant's farm at his expressed invitation, pursuant to an admitted custom, to render service, as suggested in Ganzhorn v. Reep, 234 Iowa 495, 499, 12 N.W.2d 154, 156. Defendant's evidence does not even tend to establish such fact and plaintiff maintains he does not seek recovery under this theory. Thus there is insufficient evidence to support giving the requested instruction.

Plaintiff's contention that defendant's defense required him to assume the burden of proving it is based on the assumption plaintiff had made out a prima facie case of employment by defendant at the time of his injury. He cites Buescher v. Schmidt, 209 Iowa 300, 303, 228 N.W. 26, 27. We interpret this case to hold that once plaintiff has made out a prima facie case of employment, the burden was upon defendant to go forward with evidence in support of his defense. 56 C.J.S. Master and Servant § 12. It does not aid plaintiff under the record here.

V. The jury was told in instruction 8 in order for plaintiff to recover he must first establish by a preponderance of the evidence the relationship of employer and employee existed between the parties at the time and place of injury, and if he failed to do so and the jury found such relationship did not exist, they should go no further and find for defendant. The court then defined the terms employer, employee and scope of employment and detailed tests to determine whether a person is acting as an employee of another.

We believe the instruction was correct and defendant was entitled to no more even though he sought amplification by request.

The matter is

Affirmed.

All Justices concur.